IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSEPH TOWNSEND,<br>Y40145, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JAMES D. VAUGHN, | ) |
| JOHN DOES 1-9, | ) |
| MR. GOUCHE, | ) |
| MR. BUFORD, | ) |
| MR. DILLMAN, | ) |
| MR. SULLIVAN, | ) |
| MR. HORN, | ) Case No. 24-cv-1758-DWD |
| MR. BANKS, | ) |
| LUCAS S. LEVANTI, | ) |
| JERRY D. JOHNSON JR., | ) |
| JOHN DOES & JOHN DOES 2, | ) |
| JOSHUA DUBREE, | ) |
| CAL JOHNSON, | ) |
| KARL R. BRADFORD, | ) |
| LARESHA D. REED, | ) |
| MR. MERRIMAN, | ) |
| MR. BERNARD, | ) |
| MR. BRASHER, | ) |
| DARREN GALLOWAY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Plaintiff Joseph Townsend, an inmate of the Illinois Department of Corrections (IDOC) currently detained at Pinckneyville Correctional Center, brings this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred at Shawnee Correctional Center (Shawnee).  (Doc. 1)  Specifically, Plaintiff

alleges that his First, Eighth and Fourteenth Amendment rights were violated throughout a series of events from November of 2023 to February of 2024, and beyond.  He seeks monetary and injunctive relief.

The Complaint (Doc. 1) is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A.  Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims.  *See* 28 U.S.C. § 1915A(a)-(b).  Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed.  28 U.S.C. § 1915A(b).  At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed.  *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

## THE COMPLAINT

Plaintiff names nineteen individual defendants, 9 John Doe individuals, and 2 large groups of John Does described as "multiple lieutenants, sergeant and C/O's" at Shawnee.  Plaintiff alleges his problems began during the first week of November 2023 when John Doe 1 initiated an argument with him about a statement he had made to a fellow inmate concerning line movements to and from the dietary area.  The day after the argument, Plaintiff alleges John Doe 1 demonstrated "inequality of treatment" when he reprimanded Plaintiff for briefly stepping to the left of the movement line despite other inmates being much further out of alignment than Plaintiff was at the time.  (Doc. 1 at 16).  Following the incident of being singled-out, Plaintiff alleges that on every subsequent morning John Doe 1 would walk next to him in line.

After one of his morning dietary visits, Plaintiff had a call pass to visit the healthcare unit.  (Doc. 1 at 16).  Plaintiff explained his call pass to a sergeant and C/Os.  Just moments later during his walk to the healthcare unit he was stopped and "interrogated" by Defendant Gouche.   He claims Gouche violated his Eighth Amendment rights and stopped him out of "pride and prejudiced behavior" and not for any valid reason.

The next day John Doe 2 told Plaintiff, "I don't know what you've been doing, but watch yourself on the deck and out there on the walk, they've put a target on you."  (Doc. 1 at 17).  Plaintiff alleges that after this warning he was "set upon" multiple times by John Doe 1, but he refrained from responding.

On December 3, 2023, Plaintiff attended dinner and sat in an area designated for those with a slow-eat permit because he had such a permit.  When Plaintiff was halfway done with his meal Defendant Vaughn[1] told him to leave, and insisted Plaintiff leave even after he indicated he had a slow-eat permit.  Plaintiff alleges Vaughn "deprived [him] of equality of treatment" and was deliberately indifferent.  (Doc. 1 at 17).  As Vaughn approached Plaintiff, Defendant Buford (a dietary supervisor) also approached.  Plaintiff believed Buford knew him and knew of his slow-eat permit from months of seeing him sit in that area, so he expected Buford to clarify the situation.  Instead, Buford "snatched" his tray.  Buford, Vaughn, and John Doe 3 then grabbed Plaintiff with an

---

[1] Plaintiff alleges a history of problems with Vaughn, but it is not apparent that the information is intended to form the basis for any additional claim in this lawsuit, so the information is omitted from this summary of the facts.  (Doc. 1 at 17).

intent to cuff him.  During this interaction, Vaughn twice attempted a headlock, which Plaintiff admits he maneuvered out of both times.  (Doc. 1 at 18).  Plaintiff alleges Vaughn then threw a punch which he successfully dodged.  Once Plaintiff was restrained on the ground he alleges Vaughn applied excessive force by punching him seven times until he drew blood.  Plaintiff faults Buford and John Doe 3 for failing to intervene.  (Doc. 1 at 18).  As a result of the altercation, Plaintiff was sent to restrictive housing, was deprived of his A-grade status, and was subject to "further humiliations and rights violations."  (Doc. 1 at 18).

Plaintiff alleges that on December 3, 2023, Defendant Dillman violated his rights by failing to properly inventory his property when he was taken to restrictive housing. He explains that Dillman failed to fill out an inventory slip and much of his property was stolen, but without the slip he could not recoup anything.  He faults Vaughn for creating the situation that allowed Dillman to deprive him of property.  (Doc. 1 at 19).

Also on December 3, 2023, Plaintiff alleges John Doe 4 and Defendants Sullivan and Horn violated his rights because they did not summon him to a hearing about the nature of his ticket.  He claims that "DOC 0317" gives inmates a right to be present at *all* investigative and disciplinary hearings pertaining to an inmate, but these three did not let him attend the December 3 hearing, so their actions violated his rights.  He alleges as a result he spent 186 days in segregation with "no yard, phone calls, unrestricted commissary, music, and undiminished shower capacity among many other things." (Doc. 1 at 19).

He further alleges that on December 14 or 15, 2023, Defendant Banks violated his rights by refusing to let him view video footage of the dietary altercation during an internal affairs interview.  (Doc. 1 at 19).  He claims that during the meeting Banks viewed the footage himself, insisted on a certain version of events, and made findings about the interaction that were contradicted even by Vaughn's written statement about the incident.  (Doc. 1 at 19-20).  He alleges Banks "lied on a federal document" and did not speak out about Vaughn's indiscretions.  This led to his continued detention in segregation.

On December 16, 2023, a disciplinary hearing was conducted by Defendants Levanti and Johnson Jr..  (Doc. 1 at 32).  Plaintiff claims the hearing was flawed because the underlying ticket contained an error.  Specifically, the ticket listed a "303" offense as disobeying a direct order, when in fact the "303" code correlated with giving false information to an employee.  Plaintiff claims Johnson Jr. and Levanti brushed this error under the rug by deleting the "303" charge and describing the other existing charge of "105" "dangerous disturbance" as "refused all orders in dietary."  (Doc. 1 at 20, 32).  He alleges this violated proper procedure and subject him to an ongoing liberty deprivation.  (Doc. 1 at 20-21).  The ticket reflected a punishment of 3 months C-grade, 28 days in segregation and 6 months of contact visit restrictions.  (Doc. 1 at 32).

Plaintiff goes on to challenge Vaughn, Levanti and Johnson Jr. for finding him guilty of a "dangerous disturbance" which he describes as "void for vagueness" because it is not clear what behavior is prohibited by the provision.  (Doc. 1 at 21).

Plaintiff claims on December 22, 2023, multiple John Does (lieutenants, sergeants, and correctional officers) violated his rights by ignoring his pleas for a crisis team for an hour in the morning.  He alleges he loudly and clearly requested a crisis team, but despite awareness of his psychosis and prior mental health issues, staff ignored his pleas.  (Doc. 1 at 21).  Without a crisis team, Plaintiff ingested 23 tablets of 400mg acetaminophen, and 4 tablets of 500mg naproxen.  He panicked and sought further assistance.  (Doc. 1 at 22).

He slid the empty pill packets under his cell door, but John Doe 5 merely retrieved them and tossed them in the trash.  (Doc. 1 at 22).  John Does 6 and 7 walked by his cell audibly teasing him about the pills he had ingested.

During the lunch hour, Plaintiff stuck his arm out of the food port of his door desperate for assistance.  Defendant Levanti came to his cell front and he informed him of the medications he had ingested.  Levanti departed and did not return.  (Doc. 1 at 22). Plaintiff became dehydrated, his blood pressure rose, he became numb, and he experienced a panic attack.  He collapsed on his cell floor.  A C/O ran to slam his food port shut, but then realized Plaintiff had collapsed and summoned assistance.  Levanti responded and informed Defendants C/O Johnson, Young and other John Does that he believed Plaintiff was faking a seizure.  Levanti had Johnson and Young cuff and shackle him, and then while Plaintiff was hyperventilating Levanti proceeded to sit on his back further restricting his breathing.  (Doc. 1 at 23).  Levanti eventually used the handcuffs to yank Plaintiff from the ground, causing numbness and nerve damage in both his hands. (Doc. 1 at 23).

Plaintiff alleges Defendants Dubree, C/O Johnson and Young violated his rights after escorting him to the medical unit.  At the medical unit Plaintiff slouched forward in a wheelchair because the restraints were causing pain, but Dubree repeatedly shoved him upright and insisted he sit erect.  Young then grabbed his left thumb and began to bend it backwards.  Plaintiff informed the officers he was in great pain to no avail.  Noland (a party not named as a defendant) heard the commotion and approached.  (Doc. 1 at 24).  Noland repeated the directive to sit erect.  Plaintiff and Noland apparently had some sort of argument, which Plaintiff refuses to repeat, but it does not seem Noland took any physical action towards Plaintiff.  (Doc. 1 at 24).  At some point, Plaintiff alleges Defendant C/O Johnson grabbed his entire left hand and bent it as far as possible at the wrist. (Doc. 1 at 24).  Johnson, Young, and Dubree talked openly about plans to physically assault Plaintiff, though he does not allege anything came of this.  Plaintiff claims that the events on December 22 were only possible because "violations committed against [him] on 12/3/23 were allowed to be perpetrated uncontested."  (Doc. 1 at 24).

Plaintiff claims that on December 22, 2023, Defendants Cal Johnson and Levanti violated his rights by holding investigative hearings for 3 tickets without calling him to present evidence or testimony.  (Doc. 1 at 25).  He claims he was hospitalized at the time for his suicide attempt, so the hearings should have been delayed.  He claims that ultimately, he received disciplinary sanctions that amounted to 136 days of liberty deprivation.  (Doc. 1 at 25).

Plaintiff alleges that on December 23, 2023, Defendant John Doe 8 violated his rights by allowing him to be placed in a filthy cell for suicide watch.  He describes the cell

as covered in fecal matter and mace residue, and the floor as littered with human hair. Without shoes or more than a smock, Plaintiff alleges he contracted a rash that did not clear for months.  He also was not allowed any toilet paper, and claims he contracted an additional infection for this reason.  (Doc. 1 at 25).

Plaintiff alleges that on January 2, 2024, Defendant Dillman violated his rights by depriving him of the opportunity to sign his disciplinary tickets.  (Doc. 1 at 25).  He contends rather than let him sign, Dillman prechecked the box indicating he refused to sign.  He also alleges the tickets were delivered too late, and that both things invalidated the tickets and violated his right to Due Process.  (Doc. 1 at 25-26).

On January 4, 2024, Plaintiff faults Defendants Bradford and Reed for violating his rights during a disciplinary hearing by failing to summon him to a hearing.  He attributes 130+ days of a liberty deprivation to this hearing, which involved 3 disciplinary tickets. (Doc. 1 at 26).  Specific to these tickets, Plaintiff alleges during the disciplinary sanctions he could not contact his family, he did not have leisure time outside of his cell, he could not use his electronic tablet, he could not attend religious services, he could not make purchases on commissary, and he only got three showers per week.  (Doc. 1 at 26).

Plaintiff alleges that in January of 2024, he ordered a copy of the Shawnee Inmate Rulebook and was shocked to see a photo of him published in the section of the guide concerning the Prison Rape Elimination Act (PREA).  (Doc. 1 at 26-27).  He blames Defendant John Doe 9 for this issue, and claims it violates his rights under the Eighth Amendment for a variety of reasons, including cruel and unusual punishment, "equality of treatment," and prejudiced behavior.  (Doc. 1 at 27).  He claims this exposes him to a

risk of harassment because he could be associated with sexual assaults against other inmates.

Plaintiff claims that from December of 2023 to June of 2024, Defendants Merriman, Benard, and Brasher violated his Eighth Amendment rights by denying him of all access to recreation for 182 days.  He claims that Defendant Warden Galloway is also responsible for this violation because he ordered staff to prevent offenders with certain disciplinary infractions from attending yard.  (Doc. 1 at 27-28).  Plaintiff states he spent a total of 186 days in segregation—from December 3, 2023, through June 8, 2024.  He claims he asked to go to yard every single day, but was told by Defendant Merriman that per Galloway, staff assaulters do not receive yard.  (Doc. 1 at 29).  He says at some point Defendant Benard took charge of restrictive housing and continued to prevent him from yard time.

Plaintiff alleges he grieved the issue, and in response he was told a lie, which was that he was being offered yard but kept refusing.  (Doc. 1 at 29).  Despite the restriction on yard, he admits he was discreetly approached four times in May of 2024 and offered yard.  Other than these few offers, he spent 182 days without yard at the behest of Defendants Merriman, Benard and Brasher.  He claims the total deprivation of recreation was so severe that by the time he needed to clean his cell to leave restrictive housing he was so weak he injured himself cleaning.  He claims he was left in severe pain and unable to support his weight on his right ankle for 1.5 weeks.

Plaintiff seeks monetary damages, the expungement of his disciplinary tickets, and a transfer to another facility[2] for his safety during the litigation.  (Doc. 1 at 31).  In support of his complaint, he submitted a variety of disciplinary documents, grievance documents, and the page of the offender handbook where he is depicted. (Doc. 1 at 32-60).

Based on the allegations in the Complaint, the Court will designate the following claims:

| | |
|---|---|
| **Claim 1:** | **Claim against Defendants John Doe 1, or Gouche for the verbal interactions with Plaintiff in November of 2023 during the walks to and from the dietary unit;** |
| **Claim 2:** | **Eighth Amendment excessive force or failure to protect claim against Defendants Buford, Vaughn and John Doe 3 for their actions on December 3, 2023, in the dietary unit;** |
| **Claim 3:** | **Fourteenth Amendment due process claim against Defendants Dillman, John Doe 4, Sullivan, Horn, Banks, Levanti, Johnson Jr., Vaughn, Cal Johnson, Bradford, Reed for their alleged roles in Plaintiff's disciplinary proceedings;** |
| **Claim 4:** | **Eighth Amendment deliberate indifference claim against John Does 5, 6, 7, and Levanti for ignoring Plaintiff's pleas for a crisis team or medical attention on December 22, 2023, after Plaintiff ingested a large quantity of medication;** |
| **Claim 5:** | **Eighth Amendment cruel and unusual punishment or excessive force claim against Defendants Levanti, C/O Johnson, Young, and Dubree for their handling of Plaintiff on December 22, 2023, when they located him collapsed in his cell, restrained him, escorted him to the medical unit, and remained in the medical unit demanding that he sit in a painful position;** |
| **Claim 6:** | **Eighth Amendment conditions of confinement claim against Defendant John Doe 8 for placing Plaintiff in a cell** |

---

[2] The Court notes that per Plaintiff's change of address (Doc. 8), he has already been relocated to a different facility, so there is no further injunctive relief of this sort available.

**covered in human feces and hair, without toilet paper or clothing other than a smock for 8-11 days;**

**Claim 7:**  **Eighth Amendment conditions of confinement or cruel and unusual punishment claim against Defendants Merriman, Benard, Brasher, and Galloway for depriving Plaintiff of all yard or recreation time for 186 days.**

The parties and the Court will use this designation in all future pleadings and orders unless otherwise directed by a judicial officer of this Court. Any claim that is mentioned in the Complaint but not addressed in this Order is considered dismissed without prejudice as inadequately pled under *Twombly*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face").

PRELIMINARY DISMISSALS

Plaintiff discusses a John Doe 2 in his complaint, alleging that John Doe 2 warned him he might have a "target" for recent interactions with staff. However, he did not list John Doe 2 in his list of defendants, and instead skipped from John Doe 1 to John Doe 3. The Court takes this to mean Plaintiff did not mean to state an actual claim against John Doe 2, but even if he did, there is insufficient factual support to make out any claim for a constitutional violation related to these events.

Plaintiff also names John Doe 9 and faults this individual for preparing the latest edition of the inmate rulebook, which apparently contained Plaintiff's picture next to the section on the PREA. (Doc. 1 at 26-27). Plaintiff claims this amounts to cruel and unusual punishment, a deprivation of dignity, a violation of "equality of treatment," and prejudiced behavior. However, there is no indication John Doe 9 knew that he was using

an image of an individual incarcerated at the facility or that he intended any harm by his actions. "A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation." *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982). Here, there is no suggestion John Doe 9's conduct was intentional, so the Court finds the allegations against him insufficient to support a claim and John Doe 9 will be dismissed without prejudice.

Finally, Plaintiff has named "John Does" and "John Does 2," groups of individuals that he claims passed his cell on December 22, 2023, prior to his ingestion of numerous pills, and individuals who responded that same day when an emergency was declared about his suicide attempt. Plaintiff describes the first group of John Does as every single staff member of any rank or role who walked by Restrictive Housing Seg 1 in front of the RH #1 camera from 8:30am-9:30am, during which time he was clearly and unequivocally requesting a crisis team. Plaintiff claims these individuals should have known to take action because "Shawnee" was aware of his psychosis and his suicide attempts that pre-dated his incarceration. Though he has named a large and unquantified group of individuals, he also narrows it down further to John Does 5, 6, and 7, who passed his cell during the relevant time and observed his condition. For now, the Court considers only the generic "John Does."

The naming of a mass group of "John Does" in litigation is not an appropriate placeholder. The Court also notes that Plaintiff says these unknown individuals should have known to take action, but he attributes knowledge of his mental health and suicide attempts that predate incarceration to "Shawnee" generically and not to any of the

individuals he did not know who passed his cell during the hour on December 22. Given that Plaintiff seeks to name an unquantifiable group of individuals for a homogenous action, the Court finds his allegation against the group of John Does insufficiently vague. *See e.g.,* *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (the vague allegation that one or more defendants harmed me is insufficient to establish personal involvement). This is particularly so because there are John Does 5-7, which Plaintiff interacted with more directly, and whom he also faults for his situation on December 22.

The second group of John Does are individuals that allegedly responded to the cellhouse after officers discovered that Plaintiff had collapsed from ingesting pills and called a code. Plaintiff is even less specific in describing this group than he was with the first set of John Does. The vagueness is offset by the fact that there are some named individuals that he personally describes in response to the code—Defendants Levanti, C/O Johnson, and Eric Young. Against this backdrop, the Court finds that the allegations against the John Does 2 group are insufficient to state a claim because there is an insufficient basis to plausibly establish their personal involvement in the code response on December 22.

## DISCUSSION

Plaintiff's complaint discusses a wide variety of different claims and parties for events from November of 2023 through at least June of 2024. In early November of 2023, he had some disagreements with Defendants John Doe 1 and Gouche about the way inmate lines were being run between his housing unit and the dietary building. He had a few verbal exchanges with John Doe 1 and Gouche, which he characterized as a problem

with "equality of treatment" and "pride and prejudiced" behavior. The Court takes this to mean he believes his right to Equal Protection was violated. The Court does not detect a plausible claim that Plaintiff's right to Equal Protection was violated. He had a few verbal exchanges with John Doe 1 that were prompted in part by his own comments to John Doe 1. He had a single interaction with Gouche, who he felt unnecessarily stopped he while he was en route to a medical appointment. The instances he describes sound more like annoyances than a problem of constitutional magnitude. At most, Plaintiff's allegations about his encounters with John Doe 1 and Gouche suggest some verbal harassment, which is rarely sufficient to sustain a claim for a constitutional violation. *See e.g., Beal v.* Foster, 803 F.3d 356, 358 (7th Cir. 2015) (most verbal harassment by prison guards does not rise to the level of cruel and unusual punishment). Here, the Court finds that John Doe 1 and Gouche's harassment was not the sort that amounts to cruel and unusual punishment. Thus, the Court finds Claim 1 insufficient as pled.

Plaintiff then alleges around the time of these events; John Doe 2 told him to watch himself because his actions had resulted in unidentified individuals putting a "target" on him. Things intensified on December 3, 2023, when Plaintiff ended up in a dispute with Defendants Vaughn and Buford about his slow-eat permit. Plaintiff claims that while he was still eating his meal, Vaughn abruptly directed him to leave, and would not relent when informed of Plaintiff's slow-eat permit. Plaintiff expected Defendant Buford would help him, but Buford doubled down on the command that Plaintiff leave. At this point, Plaintiff faults Vaughn, Buford and John Doe 3 for utilizing excessive force to restrain him.

An Eighth Amendment excessive force claim requires an inquiry into "whether force was applied in a good-faith effort to maintain or restore discipline, or [whether it was] applied maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The "core judicial inquiry" for an excessive force claim not the severity of the injury, but whether the force used was 'malicious and sadistic.' *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). While the Court will also consider the extent of the injury suffered in the use of force, there is no severity of injury benchmark to state an excessive force claim. *Id.*

Here, the Court seriously questions whether a plausible argument can be made that more force was used than necessary to restrain Plaintiff given that he freely admits in his pleading he twice broke free of a headlock during this encounter. However, Plaintiff also alleges that after he was restrained, Defendant Vaughn gratuitously punched him with a closed fist, and no one intervened. Reading the complaint broadly in Plaintiff's favor, as the Court must at this early juncture, Plaintiff may proceed against Vaughn, John Doe 3, and Buford for excessive force/failure to protect theories presented in Claim 2.

Ultimately, Plaintiff was also disciplined for the December 3, 2023, dining hall interaction. The discipline set off a series of disciplinary incidents—four of five in total—which cumulatively resulted in 186-days of segregation. Plaintiff attacks the due process he was afforded in association with each instance of discipline, and he uses the series of disciplinary tickets that follow the dining hall event as a common thread amongst claims that span from December 2023 to June of 2024.

In total, Plaintiff attacks a 186-day term of segregation, that appears to be a by-product of approximately five separate disciplinary tickets. He alleges that for a variety of reasons, each disciplinary proceeding was procedurally flawed, denying him due process. To establish a due process claim related to disciplinary proceedings, an inmate must demonstrate: (1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient. *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019). Six months in segregation and six months' loss or restriction of privileges—do not, without more, implicate a protected liberty interest. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) (six-month disciplinary segregation alone); *Lekas v. Briley*, 405 F.3d 602, 605, 613 (7th Cir. 2005) (temporary loss of contact visitation and restricted commissary); *Whitford v. Boglino*, 63 F.3d 527, 533 n.7 (7th Cir. 1995) (six-month disciplinary segregation and demotion to C grade). A plaintiff may also argue that the combination of disciplinary measures deprived him of a protected liberty interest. *See Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015).

Standing individually, each of Plaintiff's four or five disciplinary tickets resulted in terms of segregation ranging from 14-28 days, with one outlier garnering a 3-month segregation term. These terms are relatively short, so unless Plaintiff can establish that the conditions of segregation were abhorrent, the terms taken individually do not invoke a protected liberty interest. However, the Seventh Circuit has also suggested that multiple terms of segregation should be considered in aggregate in a due process analysis. *See e.g., Kervin*, 787 F.3d at 836; *Carrico v. Vanihel*, 2023 WL 7015274 at * 3 (7th Cir. Oct. 25, 2023) (stating that disciplinary consequences may be considered in aggregate

in a due process analysis, but finding that a plaintiff's short two-month stay in segregation not being considered in aggregate with a year in restrictive housing was not reversible error).  Considering Plaintiff's segregation stay in aggregate, he alleges he was in segregation (or crisis watch) from December 3, 2023, until June 8, 2024—a total of 186 days.

A 186-day term of segregation is less than a week over six months, a duration that is often suggested as a benchmark for a liberty interest and falls short of longer terms such as 240-days to a year that courts have suggested may automatically invoke a protected liberty interest.  *See e.g., Marion v. Columbia Corr. Inst.*, 559 F.3d 693 (7th Cir. 2008) (remanding a case for an inquiry into the conditions of 240-days of restrictive segregation); *Lockhart v. Best*, 2024 WL 197208 at * 7 (N.D. Ill. Jan. 18, 2024) (a year of segregation is the sort that may invoke a liberty interest); *Duffin v. Anderson*, 2017 WL 6028532, at *6 (S.D. Ill. 2017) (collecting cases for the proposition that a year of segregation may trigger a liberty interest).  Of the 186 days in segregation, Plaintiff describes a very short term on crisis watch with conditions that were seriously abysmal.  He spent 8 to 11 days in a crisis watch cell.  (Doc. 1 at 25).  He described the cell as crusted with human feces and covered in human hair, which he endured without toilet paper or a smock.  In this short placement, he alleges he contracted infections.

If Plaintiff's entire term of segregation, or even a significant portion was made up of conditions like those on crisis watch, then certainly his 186-day term might invoke a protected liberty interest.  However, this portion of Plaintiff's segregation was short-lived, and the conditions he otherwise described in segregation do not stand out as

particularly harsh or atypical.  Plaintiff described the conditions in one portion of his complaint as, "no yard, phone calls, unrestricted commissary, music, and undiminished shower capacity among many other things." (Doc. 1 at 19).  In another area he described segregation as including an inability to contact his family, to attend leisure time outside his cell, to use his GTL tablet, to attend chapel, to buy commissary or to shower more than 3 times a week.  (Doc. 1 at 26).

The restrictions on things like commissary, music, the GTL tablet, and phone calls do not invoke a protected liberty interest.  *See e.g.*, *Kugler v. Donothan*, 2023 WL 2958469 at * 2 (C.D. Ill. April 14, 2023) (finding that deprivation of personal electronics did not invoke a liberty interest).  Although Plaintiff could not attend chapel, he does not allege he was unable to observe his religion in some fashion.  He alleges at one point no access to "undiminished" shower, but in another area says he could not shower more than three times a week.  In *Hardaway v. Meyerhoff*, 734 F.3d 740, the Seventh Circuit concluded that just one shower a week for 182 days was not sufficient to invoke a liberty interest, so three showers a week will not sustain a claim here.  Of all the conditions identified, perhaps the most significant is Plaintiff's allegation that he could not attend yard.  But even as to yard, in *Thomas v. Ramos*, the Seventh Circuit did not find that a 70-day restriction on yard constituted an atypical and significant hardship.  130 F.3d 754, 759-62.   There is little evidence in the existing case law that the lack of access to recreation or yard is an atypical hardship that can invoke a liberty interest, though there is evidence that it may form the basis for an Eighth Amendment conditions of confinement claim.

In sum, the Court does not find that Plaintiff's allegations about his disciplinary proceedings are sufficient to state a Due Process claim under the 14th Amendment because he does not describe conditions or a duration of those conditions sufficient to invoke a protected liberty interest.  Plaintiff makes much of the fact that the prison did not follow its own internal policies and procedures for discipline, but the failure to follow internal prison directives also is not sufficient to state a claim.

Because the Court concludes that Plaintiff cannot maintain a due process claim related to his disciplinary proceedings, and he used the disciplinary proceedings to unify the remainder of the claims in the case, the Court now finds it appropriate to consider severance of the remaining claims.

## Claims 4-6

Claims 4-6 pertain to Plaintiff's mental health crisis and suicide attempt on December 22, 2023, followed by his placement in a crisis watch cell on December 23, 2023.

## Claim 7

Claim 7 pertains to Plaintiff's entire 186-day segregation stay.  Specifically, he faults Defendants Merriman, Benard, Brasher, and Galloway for denying him any recreation time for the whole duration of his segregation stay.  These four defendants are not associated with any other claims in this case.

Rules 18 and 20 of the Federal Rules of Civil Procedure provide certain limitations on the presentation of different claims against different parties in a single lawsuit.  "A litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot."  *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012).

Multiple defendants may not be joined in a single action unless the plaintiff asserts at least one claim to relief against each respondent that arises out of the same transaction or occurrence, or series of transactions or occurrences and presents a question of law or fact common to all. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). The Seventh Circuit has cautioned that courts should guard against "scattershot" pleading strategies, and that they should "target for dismissal 'omnibus' complaints—often brought by repeat players—that raise claims about unrelated conduct against unrelated defendants." *Mitchell v. Kallas*, 895 F.3d 492, 503 (7th Cir. 2018). Even if claims may be eligible for joinder under Rule 20, a Court still possesses discretion to separate the claims into distinct lawsuits. *See e.g.*, *Dorsey*, 55 F.4th at 1103.

Here, the Court finds that even if a plausible argument can be made that Plaintiff's claims are united under the umbrella of ongoing disciplinary segregation, or for any other reason, it is still an appropriate exercise of discretion to severe Claims 4-6 into one lawsuit, and to sever Claim 7 into a different lawsuit. By making this division, there will be three separate narrow lawsuits focused on almost entirely distinct legal issues, and on separate parties. This lawsuit will continue for Plaintiff's excessive force claim concerning the December 3 altercation. The legal issues for excessive force are wholly different from the deliberate indifference issues and conditions of confinement issues presented in Claims 4-6, and also from the conditions of confinement issue posed in Claim 7 about recreation or yard time. There are no common defendants across any of the three lawsuits. By dividing Plaintiff's complaint, the Court will promote a more straightforward and expedient resolution of the issues presented.

The two new cases will carry separate filing fees and could result in the issuance of a strike under 28 U.S.C. § 1915(g).  Because there are consequences to pursuing additional lawsuits, Plaintiff shall have an opportunity in each of the severed cases to inform the Court about if he wants to proceed or if he wants to voluntarily dismiss those cases.

### MOTION FOR RECRUITMENT OF COUNSEL

Plaintiff has moved for recruited counsel because he does not have the money to hire counsel, and he does not "have the resources to pursue pro bono counsel." (Doc. 9 at 1).  There is  no right to the appointment of counsel in civil matters. *Romanelli v. Suliene*, 615 F.3d 847, 851 (7th Cir. 2010).  When presented with a request to appoint counsel, the Court must consider: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself [.]" *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007).  Plaintiff has not made any showing of his own effort to find counsel, and this is required by the case law, so the Court cannot excuse this requirement on his bare assertion he has no resources to find pro bono counsel.  Additionally, this case is at the earliest stages, and it is difficult to determine the complexity of the case or Plaintiff's ability to represent himself at this stage.  To this end, Plaintiff has not provided any information about his level of education, his knowledge of the law, or why he specifically believes he requires assistance.  Thus, Plaintiff's Motion (Doc. 9) is denied without prejudice.  Any future motion must be accompanied by proof of Plaintiff's own

efforts to write counsel, as well as an explanation of the difficulties he is facing with this litigation.

### MISCELLANEOUS MOTIONS

In a Motion for Status (Doc. 5), Plaintiff asks the status of his "amended complaint" in case 24-cv-1058.  That case was voluntarily dismissed in April of 2024 without the imposition of a filing fee at Plaintiff's request because he claimed he did not mean to file the case.  As such, when Plaintiff transmitted a subsequent pleading a new case was opened.  The motion for status (Doc. 5) is **GRANTED** by the issuance of this Order, there is no further status update to provide on this matter.

Plaintiff seeks a free copy of his complaint, IFP application, and consent form.  He states he is entitled to a free copy of everything, but this is not true.  (Doc. 6).   Litigants get a copy of materials filed by *other* parties and by the Court, but they do not get a free copy of their own materials.  Copies cost $0.50/page and may be requested in writing from the Clerk of Court without filing a motion.  In this same envelope as the Motion to Copy, Plaintiff also asks that his consent form (Doc. 3) be un-sealed because he believes it should not be sealed and that the sealing of the form runs the risk of him being deprived of his right to consent to the jurisdiction of a United States Magistrate Judge.  The Court's practice is to seal consent forms only until all parties have been served and have filed their own forms.  The ability to proceed before a Magistrate Judge is controlled by the decision of *all* parties, and Plaintiff cannot demand that his case be handled by a

Magistrate Judge if the defendants do not agree.  Thus, Plaintiff's Motion for a Copy (Doc. 6) is **DENIED**.

Plaintiff's Motion for Status (Doc. 8) is **GRANTED** by the issuance of this Order.

### DISPOSITION

For the reasons stated above, the Clerk of Court is **DIRECTED** to create two additional cases. The first new case shall contain Claims 4-6 against Defendants John Does 5-7, Levanti, C/O Johnson, Young, Dubree and John Doe 8.  The second new case shall contain Claim 7 against Defendants Merriman, Brasher, Benard and Galloway.  In the new cases, the Clerk is **DIRECTED** to file the following documents:

- • This Memorandum and Order;
- • The Complaint (Doc 1).

The only claim remaining in this case is **Claim 2** against Defendants Vaughn, Buford and John Doe 3.  **Claims 1 and 3** are dismissed without prejudice for failure to state a claim. Plaintiff also failed to state a claim against John Doe 9, and the ambiguous groups of "John Does" and "John Does 2."  The Clerk of Court is **DIRECTED** to **TERMINATE** Defendants John Doe 1, Gouche, Dillman, John Doe 4, Sullivan, Horn, Banks, Levanti, Johnson Jr., John Does, John Does 5-7, C/O Johnson, Young, John Does 2, Dubree, John Doe 8, Cal Johnson, Bradford, Reed, John Doe 9, Merriman, Benard, Brasher, and Galloway.

The Clerk of Court shall prepare for Defendants Vaughn, Buford, and the Warden of Shawnee (official capacity only to help identify John Doe 3): (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Second Complaint (Doc. 1), and this Memorandum and Order to the defendants' place of employment as identified by Plaintiff. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. Section 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit Review Order.**

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs,

regardless of whether his application to proceed in forma pauperis is granted. See 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 14 days after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. See Fed. R. Civ. P. 41(b).

Plaintiff's Motion for Recruitment of Counsel (Doc. 9) is **DENIED** without prejudice.  Plaintiff's Motions for Status (Docs. 5, 8) are **GRANTED** by the issuance of this Order.  His Motion for a Free Copy (Doc. 6) is **DENIED**.

Finally, Plaintiff is **DIRECTED** to file Notice with the Court within 30 days describing John Doe 3's physical characteristics.  The Warden of Shawnee is being served with this case.  Once that party enters an appearance and Plaintiff has filed his Notice, then the Court will arrange next steps for the parties to identify John Doe 3.

**IT IS SO ORDERED.**

Dated: October 15, 2024

_____
DAVID W. DUGAN
United States District Judge

### NOTICE TO PLAINTIFF

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least 60 days from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take 90 days or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.

The Court wishes to remind the Plaintiff that litigation is often viewed a series of hurdles that the Plaintiff must clear to get to another hurdle. Initial screening is such a hurdle, but it is a very low one for the Plaintiff to clear.  As noted above, surviving initial screening only requires the bare statement of a claim that, if proven, could entitle Plaintiff to some relief. At trial, he will need to prove by a preponderance of evidence that the facts alleged.